Good morning. Boris Baljan on behalf of the petitioner Andrei Manasyan. The petitioner in this case, Your Honor, feels that he has presented a credible claim that he has suffered persecution in Armenia and would suffer persecution should he return to Armenia. The factual backgrounds which present the case before this court is the immigration judge's decision, which apparently were based on two statements at two separate interviews that the petitioner had with an asylum officer. One was on or about July 24, 2000. The other one was on or about August 16, 2000. Apparently in those interviews, especially with the earlier one, the immigration judge felt that information provided through that interview did not match his declaration attached to his asylum application and his testimony under oath at the merits hearing. We believe that the petitioner was credible through his asylum application that he provided and also during his testimony before the immigration judge. There may be minor differences in terms of statements he made to the asylum officer versus the statements he made in his declaration attached to his asylum application and his life testimony before the court at the final hearing of this case. His statement to the inspector seems to be quite widely divergent from his later statements. Is that a problem for you? Your Honor, I think which statement are we referring to? Are we referring to the July 24th statement or the August 16th? Well, what he said to the inspector was that someone was trying to inject him with medication so that he would become a drug addict and that people were trying to extort money from him and that his scar on the left leg was from being shot at by the town people, not by the military. So all of these things seem to fall out and be different in his later statements. But if Your Honor looks at the August 16th credibility interview, even the officer there determines that the petitioner was credible in his fear of persecution should he return to Armenia. So I think even though... Which is true? Well, all I can state, Your Honor, is I know this court has stated in other cases that certain features of an asylum interview make a potentially unreliable point of comparison to a petitioner's testimony for the purpose of credibility determination. I believe that was Sina Singh v. Gonzalez. And it's obvious if we take the context of somebody fleeing their native country where they're under this kind of psychological and physical pressure and they're coming to a new country, they may not have all their thoughts or wits with them. And in fact, I think if the courts reviewed the two interviews, especially the August 16th, I believe that reflects his fear that even this group that he joined up, the Yerkurpa, might have agents here in this country reporting back to the native country and he was fearful of any retribution that might be taken against him. So I believe that's understandable when somebody is living under that kind of constant fear when they come to a country and dealing with somebody with a uniform may have the same kind of impression of not remembering or maybe due to the shock of having to leave that quickly and not remembering all the things. I understand all this, but it seems like kind of an elaborate story that he told the first time. So it's hard to know where the truth lies. Well, that's true, Your Honor. But the issue again is I think the first interview is right when he crossed the border, which if we take that in the context of the second interview, which is coming three weeks later, where obviously he's a little more relaxed and can gather his thoughts a little better, you see a clearer picture of what's going on. And he does mention that political organization, I believe, in the second interview. What we usually see is in the first interview they don't elaborate and don't tell very much and then in later interviews expand on it. And this is just a changing story. In the second interview, who did he say shot him in the leg? I'd have to look at the transcript, Your Honor, to see for sure on the interview I have it here. But I don't know if I'll have enough time to read all the statements. Well, he said in his second interview that it was your graph that shot him. I have an administrative record page, I believe, that starts at page 265. That's where the credible interview notes are reflected. And I see on the first page, it looks like, third question, why did you leave Army? I was in danger. I was arrested by a group named Yergerpa. It means people who protect the country, in quotes. And then the next time I was registered in Nagorno-Karabakh and I got shot in my leg. And I believe he felt that somebody from that group had shot him in the leg, not any enemy fire from across the border there. I think any other, again, discrepancies, whether he was out to build, construct villages versus bunkers are minor. I don't think that's a major discrepancy that the IJ below could base his adverse credibility decision on. We believe he erred. We believe the BIA erred also, although they reversed on the frivolous application part of his decision below. We believe that he has a genuine fear of persecution should he return. He suffered past persecution and any discrepancies that may be reflected, whether it's at the airport interview or the subsequent August interview 2000 are minor. And as the court has stated earlier, I think in the second interview, he clarified a little bit more of what was going on with his persecution at the hands of this paramilitary group. So it's our feeling for the foregone reasons that he should be granted asylum. Tell me if this is wrong. The first time when he was asked about what happened to him, he said he got the scar on his left leg. I guess that's when he was shot. When he was in the military, the townspeople hit me. I didn't mention the Yerba Faso. Then the second time, he said, I got shot in my leg. When asked who shot him in the leg, he responded, during the war with Azerbaijan, Azerbaijan's army. And then at the hearing, he said he was shot in the leg by this other group, the Yerba Chalfo. Is that your understanding? No, Your Honor. I think in his second interview, I think he was more accurate in his explanation of how he got shot in the leg, if I recall. I think it dealt with that Yerba Faso group rather than Azerbaijani soldiers or paramilitary shooting him in his leg. In addition, Your Honor, I just want to mention that, as the Court's well aware, basically when an asylum officer conducts an interview, it's basically viewed as a quasi-prosecutorial nature. Although regulations can provide for an asylum officer to administer the oath to take any testimony, that's not something that's required either. But he was under oath? Yes, he was. And he had an interpreter? Yes, I believe he did. And the second time, he had his lawyer on the telephone? Yes, that's correct. Just to conclude, we believe he's, based upon what we stated this morning, entitled to relief for asylum and the other two remedies he's seeking, withholding removal and cap. Thank you very much. Good morning. May it please the Court, Roseanne Perry on behalf of the Attorney General. The issue before the Court today is whether the evidence compels reversal of the agency's adverse credibility finding. In this case, Petitioner's claim is replete with inconsistencies, and his explanations for those inconsistencies are implausible. The record shows that the immigration judge supported his decision with specific and cogent reasons, which were based on inconsistencies between the Petitioner's hearing testimony, his asylum application, and the previously sworn statements he made under oath. We don't usually pay too much attention to the statements that are made just as they cross the border to the inspector. We're much more concerned, I think, with inconsistencies in the asylum application and in the statements to the asylum officer. So should we just kind of put aside what he told the inspector at the beginning? I feel that there are numerous inconsistencies between the asylum interview and the mayor's hearing, enough to sustain the credibility finding, so that even if we don't consider the airport statements or the statements he made at the border, there's sufficient evidence to show that he was not credible and therefore not eligible for asylum. In regards to the gunshot wound, he testified, or he stated before the asylum officer, that he was shot by the Azerbaijani army, and that's located on page 8, it's administrative record page 265. He then stated at the mayor's hearing that he was shot by the Yirgapa. So this is a significant inconsistency, and it goes to the heart of his claim of asylum, especially where he admitted at the hearing that he lied to the asylum officer while he was under oath. The second inconsistency concerned beings that he allegedly received by the Yirgapa. He stated at the mayor's hearing that he was beaten at least twice a week for three months while he was in the hospital, but he didn't state this in his asylum application, and he didn't state this at the asylum interview. He only stated at the asylum interview that he was beaten by the Yirgapa after his release from the hospital, and this is significant because it seems as if he's just trying to enhance his claim of persecution. The third inconsistency involved the attack by the Yirgapa. He stated that he wanted to leave the group because they wouldn't pay his hospital bills, and they were upset about that. But then at the mayor's hearing, he stated that they retaliated against him because he wouldn't participate in the removal of the Jehovah's Witness. So this is another significant inconsistency that goes to the heart of his claim of persecution. The fourth inconsistency involved the type of work he performed by the Yirgapa. He said in August 2000 that he protected the border, but then he stated at the mayor's hearing initially that he was constructing villages, and later stated that he was doing military construction on trenches and bunkers. So he contradicted himself at the hearing. The significance here is that Yirgapa is a violent organization, and his different accounts raises the question of whether he was involved in the persecution of others. The fifth inconsistency concerns the complaints he made against Yirgapa. He testified that he would not persecute others, and that was one of his reasons for being persecuted himself by the whatever you pronounce the group. Right, but his contradictory statements, his inconsistent statements, you know, raise the question of whether he would. What difference does that make to this appeal? You're correct. You know, it's not really going to the heart of his claim of persecution. The fifth inconsistency concerns the complaints he made against the Yirgapa. He stated on direct examination that he only complained to his girlfriend about his activities with the Yirgapa. However, on cross-examination, he stated that he wrote letters to the government disclosing these activities. This is significant because he bases his claim in part on his attempt to make their activities known. Finally, it was implausible that he threw his passport away in Tijuana, Mexico, and that someone he barely knew retrieved the passport and brought it to him in California. For the foregoing reasons, the Court should affirm the decision below. Thank you, Justice. Thank you. Thank you. The case just argued will be submitted. Next case.
judges: B. Fletcher, Reinhardt, Rymer